**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| DAWN SINGLETON, Individually and as Parent and Guardian of KATIE SINGLETON, a Minor, and KATIE SINGLETON, on behalf of themselves and all others similarly situated | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) **CLASS ACTION COMPLAINT** ) Civil Action No.: _____ ) |
| PETLAND MALL OF GEORGIA LLC, PETLAND, INC., PAWSITIVE SOLUTIONS a/k/a SOLUTIONS PET, BRAD PARKER, DEBRA PARKER, LAMAR PARKER, and KRISTEN PARKER, | ) ) ) **JURY TRIAL DEMANDED** ) ) ) |
| Defendants. | ) |

## COMPLAINT

Plaintiffs Dawn Singleton, individually and as parent and guardian of Katie

Singleton, a minor, and Katie Singleton (collectively "Plaintiffs"), by their attorneys,

file their complaint against Defendants Petland Mall of Georgia LLC, Petland, Inc.,

PAWsitive Solutions a/k/a Solutions.Pet, Brad Parker, Debra Parker, Lamar Parker

and Kristen Parker, (collectively "Defendants"), on behalf of themselves and all

others similarly situated, the members of the class described and defined herein, and allege as follows:

## **INTRODUCTION**

1.

Plaintiffs bring this case on behalf of themselves and all others who claim to have contracted *Campylobacter jejuni* from puppies from Petland and/or who purchased puppies from Petland that were infected with the *Campylobacter* bacteria.

2.

*Campylobacter* infection, or campylobacteriosis, is an infectious disease caused by *Campylobacter* bacteria.[1]

3.

People with *Campylobacter* infection usually have diarrhea (often bloody), fever, and abdominal cramps. The diarrhea may be accompanied by nausea and vomiting. These symptoms usually start within two to five days after exposure and last about a week.

4.

*Campylobacter* occasionally spreads to the bloodstream and causes a life-

---

[1] The information set out in Paragraphs 2 through 6 is available on the website of the Centers for Disease Control and Preventionathttps://www.cdc.gov/campylobacter/index.html (accessed March 27, 2019).

threatening infection. Persons with Campylobacter are at an increased risk for three post-infection complications: Guillan-Barre syndrome (GBS), reactive arthritis, and irritable bowel syndrome.

5.

Most human *Campylobacter* illness is caused by one species, called *Campylobacter jejuni*.

6.

*Campylobacter* infection is diagnosed when a laboratory test detects *Campylobacter* bacteria in stool, body tissue, or fluids.

7.

The United States Centers for Disease Control and Prevention (CDC), several states, and the U.S. Department of Agriculture's Animal and Plant Health Inspection Service (USDA-APHIS) investigated a multistate outbreak of multidrug-resistant *Campylobacter* infections which occurred from January of 2016 through January of 2018. According to the CDC investigation, epidemiologic and laboratory evidence indicated that contact with puppies sold through Petland stores were a likely source of this outbreak.[2]

_____

[2] The information set out in Paragraphs 7 through 11 is contained in the Center for Disease Control and Prevention Report, "Multistate Outbreak of Multidrug-Resistant *Campylobacter* Infections Linked to Contact with Pet Store Puppies, Final Update, January 30, 2018, available at:

8.

A total of 113 people with laboratory-confirmed infections or symptoms consistent with *Campylobacter* infection linked to this outbreak were reported to the CDC. Illnesses were reported from 17 states. Illnesses started on dates ranging from January 12, 2016 to January 7, 2018. Ill persons ranged in age from less than 1 year to 86, with a median age of 27.

9.

Whole genome sequencing (WGS) showed that isolates from people infected with *Campylobacter* were closely related genetically. This close genetic relationship means that people in this outbreak were more likely to share a common source of infection.

10.

*Campylobacter* bacteria isolated from clinical samples from people sickened in this outbreak were resistant to commonly recommended, first-line antibiotics. According to the CDC, this means it may be difficult to treat these infections with the antibiotics usually prescribed for *Campylobacter* infections. Antibiotic

---

https://www.cdc.gov/campylobacter/outbreaks/puppies-9-17/index.html (accessed March 27, 2019).

resistance may be associated with increased risk of hospitalization, development of a bloodstream infection, or treatment failure in patients. Using WGS, the CDC identified multiple antimicrobial resistance genes and mutations in most isolates from 38 ill people and 10 puppies in this outbreak.

11.

Ninety-nine percent of people with illness reported to the CDC had reported contact with a puppy in the week before illness started, and 87% had reported they had contact with a puppy from Petland stores or reported they had contact with a person who became sick after contact with a puppy from a Petland store. Of those reported as ill to the CDC, twenty-five worked at Petland stores. Since the symptoms of a *Campylobacter* infection can be confused with illnesses like the flu, the flu is not a CDC reportable illness, and given Defendants' misrepresentations further alleged below, many people infected with *Campylobacter* likely did not know the true nature of their illness, and even fewer were likely to have had their illness reported to the CDC. As such, the number of reported illnesses to the CDC is likely small compared to the larger number of actual individuals suffering illness from exposure to Defendants' puppies infected with the *Campylobacter* bacteria. As the CDC itself notes, the completeness of information on notifiable infectious diseases and conditions was highly variable and related to the disease or condition being

reported.

12.

Petland Inc. is a retail pet store with approximately 140 retail locations in 31 states. Each of these retail locations is either owned by Petland or operates as a franchised business under the direction and control of Petland ("Petland franchisee").

13.

Petland requires that each of its retail locations purchase puppies from suppliers it has approved, and nearly every supplier is either a puppy mill or a puppy mill broker. A "puppy mill" is "a dog breeding operation in which the health of the dogs is disregarded in order to maintain a low overhead and maximize profits." *Avenson v. Zegart*, 577 F. Supp. 958, 960 (D. Minn. 1984).

14.

Defendants have orchestrated and executed a scheme to defraud consumers by manufacturing a fictitious market for puppy mill puppies. This scheme is carried out by Petland, which requires its approximately 140 retail locations across the country to sell these puppies to unsuspecting consumers while misrepresenting them as "the finest available" puppies from "professional and hobby breeders who have years of experience in raising quality family pets," which are "USDA approved."

15.

Petland has used its distribution capabilities to create a demand for puppy mill puppies where there would otherwise be none, given the well-documented health and socialization issues of puppies bred in puppy mills. Without regard for the serious concerns about the health and well-being of the animals sold or forced to continually breed, the quality of the puppies they sell, their misrepresentations about those puppies to their customers or the health of their customers themselves, Petland requires its retail locations to source puppies they sell from only those puppy mills or puppy mill brokers that Petland determines.

16.

Plaintiffs and class members placed their trust in the Defendants. Relying primarily on the Defendants' written representations that their puppies were healthy animals--"hand-picked" from reputable, USDA-licensed breeders--Plaintiffs and class members paid significant sums to purchase animals that they expected to be of the highest quality. They were willing to pay a premium because they desired healthy puppies from humane sources.

17.

The representations made to Plaintiffs and class members by Defendants, including those described above, were false.

18.

Dogs and puppies raised in these types of facilities are frequently confined in tiny cages and deprived of adequate veterinary care, food, water, exercise or mental stimulation. On information and belief, the illnesses and congenital or hereditary conditions suffered by the puppies Defendants sold to Plaintiffs and class members were the result of substandard housing conditions, a disregard for proper canine husbandry practices, and/or irresponsible breeding practices. Indeed, the particular diseases and defects suffered by Plaintiffs' and class members' puppies - including, but not limited to, parvovirus, hip dysplasia, respiratory disease, hypoglycemia, heart conditions, and compromised immune systems - are typical of those found in dogs bred in puppy mills and other substandard breeding facilities.

## **PARTIES**

19.

Plaintiff, Dawn Singleton, an individual, and parent and guardian of Katie Singleton, a minor, is a resident of Gwinnett County, Georgia. Singleton brings this claim on behalf of her daughter and in a representative capacity on behalf all individuals similarly situated.

20.

Plaintiff, Katie Singleton, a minor, is a resident of Gwinnett County, Georgia.

21.

Defendant Petland, Inc. is an Ohio corporation with a registered principal place of business at 250 Riverside St., Chillicothe, Ohio 45601. Petland, Inc. was registered with the Georgia Secretary of State as a foreign corporation with a registered agent for service located at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092, until December 7, 2016.  Petland, Inc. is the largest national retailer selling puppies to consumers and conducts its operations through approximately 140 retail store franchisees in the United States.

22.

Petland, Inc. exercises strict control over, and mandates uniformity from, its franchisees. As stated in its franchise agreements, an example of which Petland, Inc. publicly filed in unrelated litigation involving a Sarasota, Florida store, Petland, Inc. provides extensive training to its franchisees on its "unique system," which it defines as "the uniform standards, methods, techniques, and expertise, procedures, and specifications developed . . . for establishing, operating, and promoting a retail pet business." According to Petland, Inc., "the distinguishing characteristics of Our System . . . include . . . operating methods, procedures, and techniques for the care and sale of pets," "procedures, methods, and techniques for inventory and cost controls," and the "Confidential Operating System" and "Confidential Information,"

among other features. Upon information and belief, the use of animal certifications, preferred veterinarians, and customer service providers such as PAWSitive are typical or standard practices at Petland stores.

23.

Franchisees receive three weeks of training at Company headquarters and three more weeks in their new store. Petland, Inc. also provides a one-week, in-person stint at a high-volume franchisee, such as Petland Kennesaw. Petland, Inc. receives royalties from its franchisees based on their success. In the case of the Sarasota, Florida location, for example, the franchisee pays Petland, Inc. a weekly royalty fee of 4.5% of gross revenues.

24.

Defendant Petland Mall of Georgia LLC is a typical franchisee of Petland, Inc. It is a Georgia corporation with its principal offices located at 3333 Buford Drive, Suite 2068A, Buford, Gwinnett County, Georgia 30519.

25.

Petland Mall of Georgia LLC is owned and managed by Lamar Parker, his wife Debra Parker, their adult son Brad Parker, and Brad Parker's wife Kristen Parker. The Parkers own and manage other Petland stores, including Petland Kennesaw. Upon information and belief, Petland, Inc. is known to use Petland

Kennesaw as a training ground for other franchisees to ensure its practices and policies are uniformly and consistently applied nationwide.

26.

Defendant PAWSitive Solutions, Inc. a/k/a Solutions.pet is an Illinois Corporation with its principal offices located at 3380 Lacrosse Lane, Suite 100, Naperville, Illinois 60564. Upon information and belief, PAWSitive contracts with Petland, Inc. and Petland franchisees nationwide (in addition to Petland Mall of Georgia LLC).

27.

PAWSitive holds itself out to be a customer "claims" manager or "Concern Specialist" offered to Petland pet purchasers. Pursuant to its warranties, Petland instructs customers to call PAWSitive as a matter of first recourse if the animal is found to be ill after purchase.

28.

PAWSitive is not a veterinary clinic and does not provide independent pet care advice to Petland customers. Instead, it acts in concert with Petland to direct customers to Petland's preferred veterinarians and away from independent veterinarians, and to divert or dissuade customers from attempting to make good on Petland's warranties. PAWSitive also exists to sell additional services and programs

to Petland customers after the purchase of their pets, such as special registrations.

29.

PAWSitive's corporate registration lists five other "Assumed Names," one of which is Third Party Pet. The website for this entity reveals the true corporate purpose for PAWSitive, and states that the entity "is not just a third-party service company . . . *we act more as a business consultant, to help pet store owners increase their profitability, than we do a service company."* The website further confirms that the entity exists to fix "holes in the management of pet store sales and procedures," and contains nine testimonials—all from Petland franchisees. Petland conceals these damning facts about PAWSitive from customers at the point of sale, making its warranties for "services" from PAWSitive a sham.

30.

Despite paying for the health certifications and for services from PAWSitive and Petland's "preferred veterinarians" as part of the purchase price for their pets, Petland concealed from Plaintiff and other class members that My Pets Vet, and PAWSitive were incentivized or directed to take actions that were in the best interests of Petland—not the customers and animals for whom they purported to provide service. To the contrary, the warranties and representations provided to all customers implied that these Defendants would provide independent and unbiased

professional services and advice, and would serve the best interests of the customers and their pets, not the financial interests of Petland.

31.

Defendants Kristen Parker, Lamar Parker, Debra Parker and Brad Parker are owners and managers of Petland Mall of Georgia LLC with their principal place of business at 537 John Tate Road, Acworth, Cobb County, Georgia 30102.

32.

Plaintiff alleges, upon information and belief, that at all times herein, Defendants' agents, employees, representatives, executives, directors, partners, and/or subsidiaries were acting within the course and scope of such agency, employment, and representation, on behalf of Defendants.

## **JURISDICTION AND VENUE**

33.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this is a class action involving: (a) 100 or more members in the proposed class; (b) where at least some members of the proposed class have different citizenship from some defendants; and (c) where the claims of the proposed Class members exceed the sum or value of five million dollars ($5,000,000) in the aggregate. 28 U.S.C. §§ 1332(d)(2) and (6).

34.

While the exact number of members in the proposed class is unknown at this time, Plaintiff has reason to believe that thousands of individuals have purchased *Campylobacter* infected puppies from Petland and may have contracted the *Campylobacter* infection throughout the country during the Class Period. The actual number of Class members can be discerned from the records maintained by Petland.

35.

While the exact damages to Plaintiff and the members of the Classes are unknown at this time, Plaintiff reasonably believes that their claims exceed five million dollars ($5,000,000) in the aggregate.

36.

This Court has personal jurisdiction over Defendants because Defendants are residents in the State of Georgia, and/or have purposefully availed themselves of the privilege of conducting business in the State of Georgia. Ohio-based Defendant Petland, Inc. maintains close ties with its Gwinnett franchise and other franchisees in Georgia, receiving substantial revenue from the stores through royalties. Illinois-based Defendant PAWSitive is Petland's purported customer service agent, serving Petland's Georgia franchises and regularly interacting with Georgia purchasers of Petland animals.

37.

This Court also has personal jurisdiction over all Defendants pursuant to 18 U.S.C. § 1965(d), which provides for nationwide service of process.

38.

Venue is proper in this District pursuant to 28 U.S.C. § 1391 because many of the acts and transactions giving rise to this action occurred in this District, and because some or all of the Defendants:

a.    have intentionally availed themselves of the laws and markets within this District through the promotion, marketing, distribution, and sale of pets in this District;

b.    do substantial business in this District, including maintaining its principal place of business in this District; and

c.    are subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

39.

Katie Singleton is a minor who began to work at the Petland Mall of Georgia LLC store in December 2017 as a "puppy counselor" with duties including selling puppies to Petland customers.

40.

Plaintiff Dawn Singleton purchased a miniature Schnauzer puppy from Petland Mall of Georgia LLC on December 30, 2017. Unknown to Plaintiff Dawn Singleton, at the time of purchase that puppy was infected with *Campylobacter jejuni.*

41.

Shortly after Katie Singleton's employment she was assigned to scrub all puppy kennels, and clean up the kennels if the puppies became sick or were quarantined.

42.

On an average day 10 puppies would be in quarantine.

43.

Puppies that exhibited diarrhea would automatically be isolated from other puppies and placed on antibiotics.

44.

Katie observed numerous puppies exhibiting diarrhea and coughing. Many of the puppies were very lethargic.

45.

Each day she worked Katie would clean feces out of the puppy kennels. Each

time a puppy defecated or vomited, she would wipe down that puppy's kennel.

46.

The puppy feces often contained blood.

47.

As a result of her exposure to Petland puppies that carried the *Camphylobacter* bacteria Katie contracted the illness.

48.

On January 9, 2018, Katie came home from work ill and exhibited a fever of 103 degrees. She took Tylenol to relieve the fever, but later that day exhibited a fever of 104.7 degrees.

49.

Her mother, Dawn Singleton, immediately took Katie to the Atlanta Urgent Care Emergency Room at Hamilton Mill, where she was examined by a physician.

50.

She exhibited very low blood pressure, was given medication and fluids for hydration, and taken by ambulance to Children's Healthcare of Atlanta.

51.

Katie Singleton spent that night in the Emergency Room at Children's Healthcare, where she began to display severe diarrhea. She was admitted to

Children's Healthcare the following morning.

52.

Plaintiff spent four days at Children's Healthcare as physicians attempted to diagnose the cause of her condition. Eventually the physicians diagnosed the cause of her illness as *Camphylobacter jejuni.*

53.

Plaintiff was discharged into the care of her regular physicians at Buford Family Practice. She continued to suffer from diarrhea for an additional two weeks and was unable to attend school in that period.

54.

Plaintiff Katie Singleton has continued to suffer adverse health effects has a result of contracting *Campylobacter jejuni* from Petland puppies.

55.

Petland, Inc. and its franchisees, including Petland Mall of Georgia LLC, buy animals from known puppy and kitten mill breeders and brokers, both licensed and unlicensed, by the USDA.  Brokers purchase animals from puppy and kitten mills at a relatively nominal price – roughly $50 to $200 per puppy.  Petland, Inc. and its franchises, including Petland Mall of Georgia LLC, purchase the puppy or kitten from the broker and sell it at premium – on average, for $2,000 to $3,000.  Some

puppies have sold for over $15,000.00.   Petland, Inc. and its franchises earn enormous profits by sourcing their animals from puppy and kitten mills.

56.

These puppy and kitten mills operate like an assembly line in which breeders maximize profits by producing the largest possible number of puppies and kittens with little to no regard for the health and welfare of the breeder dogs or cats or their puppies or kittens. Puppy and kitten millers and the retail stores do not provide these animals proper nutrition, shelter, veterinary care, or socialization because if they did, the commercial sale of dogs and cats would no longer be financially viable for the breeder, broker, or retail store.

57.

Although many of these brokers and breeders are licensed by the USDA, USDA-licensed breeding facilities can be, and often are, puppy and kitten mills that are generally known to produce animals with significant health defects.

58.

The conditions at these breeding facilities often degenerate to a point of disregard for the welfare of the dogs and cats, leaving them in unsanitary, overcrowded conditions without adequate veterinary care, food, water, exercise, or mental stimulation and socialization.

59.

As a result of these conditions and a disregard for proper canine and feline husbandry practices, puppies and kittens whelped at a mill are highly prone to debilitating and life-threatening conditions, such as: the *Campylobacter* infection and canine distemper, kennel cough, pneumonia, Giardia, parvovirus, respiratory disorders, mental instability, epilepsy, heart disease, kidney disease, intestinal parasites, chronic diarrhea, oral/dental problems, luxating patellas, and other congenital and/or hereditary conditions.

60.

Petland puppies and kittens are prone to these conditions not only because of the conditions in which they are raised, but because they are typically taken from their mothers at just eight weeks of age, packed together, and shipped on trucks for hundreds or even thousands of miles before arriving at Petland stores.

61.

Indeed, Dr. Michael Good, DVM ("Good"), the former preferred veterinarian for another Petland franchisee in Georgia, testified in an unrelated case that the "overwhelming majority" of the store's animals arrived sick as a result of the conditions in which "they were raised and their exposure to other sick animals while in transit." Good testified that illnesses are incubating in the newborn animals *but*

*not yet symptomatic* at the time of their sale.

62.

The scheme described herein allows Petland to channel concerns and complaints about the health of its animals into service and veterinary entities that Petland itself can influence or control. The scheme allows Petland to preserve its high profit margins and conceal the breeding conditions and health risks of the animals it sells. Since Petland, Inc. is a nationwide retail chain and sources its animals from a variety of locations, the scheme described herein has a direct effect on interstate commerce.

63.

Petland gives a certificate of a "Veterinarian Health Exam" to all animal purchasers at the time of sale, certifying that each animal is "free of any internal or external parasites" and "healthy and fit for adoption." Similar certification language is included in the "Limited Puppy Purchase Contract" that is also provided to each customer, which states that each animal "has been vet checked twice before being sold" and is "free of parvovirus, distemper, hepatisis [sic], corona virus, and canine influenza for ten days from the date of purchase."[3] The contract further states that Petland "has taken every step possible to sell a quality pet."

---

[3] Exhibit A attached hereto is the "Limited Puppy Purchase Contract" that Plaintiff received.

64.

Upon information and belief, Petland pays the preferred veterinarians a fixed rate each month in exchange for their agreement to certify that they have inspected each shipment of puppies and kittens, and that each animal is "healthy" and "fit for adoption."

65.

These certifications allow Petland to inflate the prices of the animals they sell since Petland leads customers to believe they are purchasing a healthy pet— one whose health has been evaluated in a meaningful way by a licensed veterinarian. Plaintiff and other Class members relied on these certifications to assess the health of the animals they purchased, and would not have purchased their animals or paid the price charged by Petland absent such representations.

66.

However, these certificates are little more than a sham. Dr. Good, the former preferred veterinarian, confirmed that the "certification" process itself is inherently unreliable. Not only did the "overwhelming majority" of animals arrive at the store already sick, but even those that did appear healthy should not have been certified because symptoms of illness often do not manifest "until approximately 7- 10 days after arrival." In fact, Dr. Good affirmed that Petland's goal was to get pets off the

sales floor and into customers' homes within seven to 10 days of acquiring them, before the animals developed full-blown illnesses with clinical symptoms that would be apparent to the customer. Furthermore, the management of the Petland franchisee where Dr. Good repeatedly made clear to Dr. Good "that they did not want customers knowing where their animal came from," how sick it was, or "why the animal was sick." Dr. Good ultimately resigned as preferred veterinarian because the Petland franchisee management demanded that he stop "telling customers" that their dogs "are sick."

67.

Reports from other stores indicate the practices described above are consistent nationwide. Indeed, in unrelated litigation, there was testimony that "Petland Corporate" required a specific protocol for the treatment and sale of sick animals and that the store would follow the protocol, demonstrating that Petland, Inc. exercised control over its franchisees' practices to ensure its fraud is carried out uniformly and consistently nationwide.

68.

Petland, Inc.'s self-proclaimed top-down corporate structure also demonstrates the uniform nature of this scheme to defraud customers with bogus health certifications and warranties. According to its franchise agreements, Petland,

Inc. insists upon "uniform standards, methods, techniques, and expertise, procedures, and specifications . . . for establishing, operating, and promoting a retail pet business," whose "distinguishing characteristics" include uniform "operating methods, procedures, and techniques for the care and sale of pets" and "procedures, methods, and techniques for inventory and cost controls."[4]

69.

Indeed, Petland franchisee training is extensive, including at least three weeks of "training academy sessions" at corporate headquarters, as well as a one-week, in-person stint at a high-volume franchisee, like Petland Mall of Georgia, and additional in-store training at the franchisee's new store. Petland, Inc.'s website touts these extensive training programs for its franchisees, promising to help franchisees "build[] a team of Pet Counselors and Animal Care Technicians to help [them] carry out [their] business plan."[4] Petland, Inc. describes its Pet Counselors as "the key factor in Petland stores achieving remarkable sales per square foot and exceptional margins on the sales of specialty products."[5]

---

[4] *See* Franchise Agreement, attached hereto as Exhibit B.

[5] *See* Petland website, Franchise Opportunities, http://www.petland.com/franchise/training.htm (last accessed April 1, 2019).

70.

Upon information and belief, the scheme to misrepresent and conceal the true health risks of Petland's animals, and to sell them before symptoms of disease can manifest, is part of the "unique system" that has been exported to franchisees around the country in order to drive up profits.   Moreover, such scheme hides from purchasers of Petland's puppies the risk of human infection of the *Campylobacter* bacteria from those puppies.

71.

Petland, Inc. financially incentivizes its franchisees and employees to sell pets regardless of the animals' health. Sales are commission-based with each employee receiving a percentage of the animals' purchase price. Franchisees are also rewarded with bonuses for meeting yearly sales goals.  Petland thus incentivizes management and sales staff to make any misrepresentation necessary to guarantee the sale of an animal, no matter how sick it may be.  Naturally, some of these profits also flow back to Petland, Inc., as weekly royalty fees of 4.5% of gross revenues.

72.

Petland engages in three additional practices that further conceal its overall scheme. First, Petland requires its customers to use PAWSitive (a/k/a Solutions.pet or Third-Party Pet) as the point of contact for any health issues with their new pet.

Petland accomplishes this by requiring customers to sign a "Puppy/Kitten Purchase Verification" at the time of purchase, agreeing that PAWSitive is the "first resource" for any concerns about their pet's health. Petland suggests to customers that PAWSitive is an independent advisor staffed with "specialists" ready to help with the animals' and customers' problems, but actually it is effectively a subsidiary of Petland, which is directly or indirectly owned or controlled by Petland.

73.

Indeed, contrary to its representations that it is an independent or customer agent for health care, PAWSitive "*act[s] more as a business consultant, to help pet store owners increase their profitability, than [it] do[es] a service company*." In other words, rather than looking out for the best interest of the customer or their new pet, PAWSitive is focused on protecting its corporate client—Petland—including by reducing Petland's costs to increase its profitability and conceal the risks to pet and human associated with the *Campylobacter* bacteria.

74.

Second, Petland conceals and furthers its scheme by requiring customers to use Petland preferred veterinarians and restricting them from going to independent veterinarians that are not controlled by Petland.

75.

Likewise, customers who contact PAWSitive are routinely directed to a preferred veterinarian (if any further treatment is recommended at all). As with the use of PAWSitive, the use of this preferred veterinarian network is similarly an attempt by Petland to control its customers and conceal the scheme by attempting to prevent, or minimize the number of, independent veterinarians from examining the puppies and informing customers that they were sold a puppy that was already sick and as a result exposing the misleading nature of the health certificate.

76.

Third, Petland gives customers two instructional sheets regarding hypoglycemia and "canine cough" (also called kennel cough) that conceal Petland's misrepresentations by dissuading customers from seeking immediate veterinary assistance for potentially life-threatening conditions and knowing of the risk to themselves from exposure to the *Campylobacter* bacteria from those puppies.

77.

The canine cough instructions state that "gagging cough, sometimes accompanied by sneezing and nasal discharge," while "annoying . . . does not usually develop into anything more serious." These instructions also state that canine cough "is not 'cured' but must run its course."

78.

By analogizing canine cough to the common cold, Petland leads customers to believe that upper respiratory illness in puppies is not a cause for concern. This deters new puppy purchasers from seeking immediate veterinary attention for their dangerously sick puppies, who may develop life-threatening pneumonia from untreated canine cough. Dissuading customers from seeking medical attention for canine cough also protects Petland from having to pay for dogs' care under its warranties. The fact that Petland provides all customers with this document also demonstrates that it is fully aware that it is selling puppies that are highly likely to have health defects and its supposed certifications of health are false.

79.

The hypoglycemia handout has a similar purpose. The sheet warns that if the puppy is "lethargic, unresponsive, unwilling to eat, or even comatose," this could be the result of hypoglycemia caused by the "stress" of its new environment or too much play. Petland thus instructs customers to "limit the amount of time your puppy plays," "make sure the puppy eats his meals," and give him certain supplements. The handout makes clear that illness and death due to hypoglycemia is the customer's responsibility or fault, not Petland's.

80.

Like the instruction sheet for canine cough, the hypoglycemia instructions give the customer the illusion that a puppy's lethargy, unresponsiveness, and unwillingness to eat are symptoms of a preventable condition caused by the customer's actions as opposed to a serious illness present in the animal at the time of purchase, like parvovirus.

81.

Petland's representations regarding hypoglycemia and canine cough are part of its scheme to conceal any serious health issues an animal may have at the time of purchase, and to deter customers from seeking necessary veterinary treatment for their pets that Petland would be obligated to reimburse under its warranties.

82.

At its core, Petland's misrepresentations allow it to charge premium prices for puppies and kittens that customers believe are "certified" to be healthy and backed up by warranties and services, when Petland knows full well it is selling puppy and kitten mill-sourced animals prone to illnesses and other defects, with sham warranties and offers of "service" not worth the paper they are written on. Plaintiff and all other Class members therefore suffered economic harm by paying a price for a "premium product," but not receiving the benefit of the bargain.   Moreover,

purchasers of Petland's puppies that contract the *Campylobacter* infection are harmed by the effects of the disease and are put at tremendous risk given the misleading nature of Defendants' misrepresentations that conceal the true cause of their illness.

## CLASS ACTION ALLEGATIONS

83.

Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and seek certification under the applicable provisions of Rule 23 on behalf of three classes as defined below:

> All persons, since January 1, 2016, who contracted *Campylobacter jejuni* from a puppy purchased from a Petland franchise in the United States.

> All employees of any Petland franchise in the United States since January 1, 2016, who contracted *Campylobacter jejuni.*

> All persons, since January 1, 2014, who purchased a puppy infected with *Campylobacter jejuni* from a Petland franchise in the United States.

84.

Excluded from the class are Defendants, including any parent, subsidiary,

affiliate or controlled person of a Defendant and its officers, directors, agents employees and members of their immediate families; and the judicial officers to whom this case is assigned, their staff, and the members of their immediate families.

85.

The number of members of the classes are so numerous that individual joinder of all its members is impracticable. To date, the CDC has reported that at least 108 people have been infected by pets sold at Petland. The true number of impacted persons is likely much higher since most people do not report their illnesses to the CDC, the symptoms may not be so serious as to induce an impacted person to seek emergency medical treatment, such symptoms may not be accurately diagnosed, medical service providers do not report the symptoms to the CDC or may only treat the symptoms without determining the cause and/or Petland's misrepresentations concealed the true nature of their illnesses.  Petland and its franchisees have sold thousands, if not hundreds of thousands, of contaminated puppies during the class periods.

86.

In this action, significant common issues of law and fact exist relating to the causes of contamination and sources of contaminated Petland puppies;  the related

conduct of Petland in its policies, practices and training of franchisees to sell contaminated puppies before their symptoms erupt, conceal their ill health from customers, misrepresent their certified healthy condition to customers, misrepresent the value of the health certifications and warranties, mislead customers as to the nature of any illnesses they might observe, mislead customers as to the nature and purpose of PAWserve, and mislead and induce customers to use Petland approved veterinarians rather than the customer's own veterinarians; and the resulting liability of Petland.  These common questions of law and fact predominate over any issues affecting only individual class members.

87.

Plaintiffs' claims are typical of the claims of the Classes. The harm to Plaintiffs and the members of the Classes was caused by Petland's wrongful conduct. Puppies sold by Petland, and which harmed the Plaintiffs, suffered from the same defect, *Campylobacter* contamination, from the same source that caused harm to all other class members.

88.

This Court may elect, in its discretion to maintain these claims as a class action under Rule 23(b)(1,) (b)(3,) and/or 23(c)(4)(A) of the Federal Rules of Civil Procedure.

89.

Class certification is appropriate pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure because the prosecution of separate actions by the individual members of the classes would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Petland and/or because adjudications respecting individual members of the classes would, as a practical matter, be dispositive of the interests of the other members or would risk substantially impairing or impeding their ability to protect their interests.

90.

Class certification is also appropriate pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common issues of law and fact predominate over issues involving only individual Class members.

91.

Plaintiffs are members of the classes described herein and their claims are typical of the classes.

92.

Plaintiffs will fairly and adequately represent and protect the interests of the members of the classes. They have no interests that are adverse to the interests of

the class.

93.

Plaintiffs have retained counsel competent and experienced in complex tort, consumer, and class action litigation.

94.

A class action approach is superior to other available methods for the fair and efficient adjudication of this dispute because common questions of law and fact predominate over any questions that may affect only individual members of the class and there would be significant economies to the courts and the parties in litigating the commons issues on a class wide basis rather than in repetitive individual trials. A class approach would consolidate these matters and create few management difficulties because it would provide the benefits of unitary adjudication, judicial economy, economies of scale and comprehensive supervision by a single court.

95.

Class certification is also appropriate because this Court can designate particular claims or issues for classwide treatment pursuant to Rule 23(c)(4)(A) and may designate one or more subclasses pursuant to Rule 23(c)(4)(B) of the Federal Rules of Civil Procedure.

## COUNT I

## Negligence

96.

Plaintiffs incorporate the allegations in paragraphs 1-95 as if fully set forth herein.

97.

Given the infectious disease nature of the *Campylobacter* bacteria and the known risk of illness in the puppies they were selling, Defendants owed important duties to Plaintiffs and class members to use reasonable care in the distribution and sale of their puppies that could have prevented or eliminated the harm alleged, including the duties to:

- Prevent puppies contaminated with *Campylobacter* from being handled or sold to the public*;*

- Prevent Plaintiffs and class members from being exposed to *Campylobacter*;

- Prevent Plaintiffs and class members from contracting the *Campylobacter* disease from the puppies they sold;

- Properly notify Plaintiffs and class members of the risk that the puppies they were handling or had purchased carried the *Campylobacter* disease;

- Properly notify Plaintiffs and class members of their risk of exposure to *Campylobacter* if they got sick after handling a Petland a puppy; and

- Properly notify Plaintiffs and class members of the urgent need to seek appropriate medical treatment, and advise their medical providers of the potential exposure to *Campylobacter* if they got sick after handling a Petland puppy. .

Defendants breached these duties, among other duties they owed to Plaintiffs and the class members, and therefore were negligent.

98.

Defendants also had a duty to comply with all statutes, laws, regulations, and safety codes pertaining to the distribution, storage, and sale of their puppies but failed to do so and were therefore negligent. Plaintiffs and class members are among the class of persons designed to be protected by these statutes, laws, regulations, safety codes and provisions pertaining to the distribution, storage, and sale of similar puppies.

99.

Defendants also had the duties to properly protect, supervise, train, and monitor their employees, and ensure compliance with all applicable statutes, laws, regulations, or safety codes pertaining to the distribution, storage, and sale of the puppies, but they failed to do so and were therefore negligent.

100.

As a direct and proximate result of Defendants' negligence, as set forth above, Plaintiffs and class members sustained injuries and damages in an amount to be determined at trial.

## **COUNT II**

### **Negligent Misrepresentation**

101.

Plaintiffs incorporate the allegations in paragraphs 1-100 as if fully set forth herein.

102.

At all times relevant. Defendants had the duties to not make false or misleading statements of fact in the sale of their puppies or withhold critical truthful information about the human health risks of exposure to those puppies if they were contaminated with *Campylobacter*.  Defendants breached these duties by, among

other things:

- falsely representing that their puppies were healthy, that the health certificates were not false, and that the puppies were bred and sourced from reputable, USDA-licensed private breeders;

- misdirecting Plaintiffs and class members to innocuous reasons for symptoms displayed by the puppies that would have revealed contamination with *Campylobacter* and/or other serious illnesses;

- actively promoting and misdirecting Plaintiffs and class members to exclusively use the PAWSitive website and referring Plaintiffs and class members to use colluding veterinarians that concealed the true nature of the puppies' illnesses and the falsity of the good health certificates Petland provided at the time of the sale; and

- Concealing from Plaintiffs' and class members the symptoms of *Campylobacter* and the risk to humans from exposure to it.

103.

Defendants' misstatements of fact, and omissions of material fact, were a common, routine practice of Defendants, who had been trained by Petland in such matters. These common practices occurred as part and parcel of every puppy sale

made by Defendants to class members, and Plaintiffs, during the class periods at issue.

104.

Petland, Inc. exercises strict control over, and mandates uniformity from, its franchisees. According to Petland, Inc., "the distinguishing characteristics of Our System . . . include . . . operating methods, procedures, and techniques for the care and sale of pets," "procedures, methods, and techniques for inventory and cost controls," and the "Confidential Operating System" and "Confidential Information," among other features. Upon information and belief, Defendants' use of animal certifications, preferred veterinarians, and customer service providers such as PAWSitive are typical or standard practices at Petland stores, as are the distribution of misleading flyers and brochures about the reasons for new puppy illnesses when brought home.

105.

Defendants' misstatements of fact, and omissions of material fact, were untrue and/or misleading when made.

106.

Defendants' misstatements of fact, and omissions of material fact were made to induce the Plaintiffs and class members to purchase their puppies by and through

Defendants, Petland Mall of Georgia LLC and other Petland franchisees.

107.

Defendants breached their duty to not make false or misleading statements of fact in the sale of their puppies.  But for Defendants' misrepresentation, Plaintiffs and class members would not have purchased their puppies from Petland, of, if they did, would not have agreed to the warranty and/or would have used their own veterinarian.

108.

As a direct and proximate result of Defendants' misrepresentations and omissions of fact as set forth above, Plaintiffs and class members sustained injuries and damages in an amount to be determined at trial.

## **<u>RELIEF REQUESTED</u>**

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment against Defendants and all persons in active concert or participation with Defendants, granting the following relief:

a.  for actual and incidental damages, pain and suffering, and punitive damages for the personal injuries of Plaintiffs and class members sustained from having contracted the *Campylobacter* disease;

b.  for actual and incidental damages to Plaintiffs' and class members'

personal property, including the purchase price and all veterinary expenses incurred from purchasing a puppy contaminated with *Campylobacter*;

c. for preliminary and permanent injunctive relief prohibiting the Defendants from continuing to engage in the selling of puppies contaminated with *Campylobacter;*

d. for preliminary and permanent injunctive relief prohibiting the Defendants from continuing to engage in the deceptive acts and practices, misrepresentations, and other unlawful conduct alleged herein;

e. for preliminary and permanent injunctive relief requiring Defendants to disclose the warning signs of puppies contaminated with *Campylobacter*, and disclosing the potential human health risks of *Campylobacter*;

f. for reasonable attorneys' fees and costs;

g. for any other relief that this Court may deem appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all Counts of the Complaint so triable.

Dated: April 2, 2019

> Respectfully Submitted,
> */s/ David J. Worley*
> David J. Worley
> Georgia Bar No. 776665
> James M. Evangelista
> Georgia Bar No.  707807

**EVANGELISTA WORLEY, LLC**
8100 A. Roswell Road
Suite 100
Atlanta, GA 30350
Tel: (404) 205-8400
david@ewlawllc.com
jim@ewlawllc.com


/s/ *Irwin M. Ellerin*
Irwin M. Ellerin
Georgia Bar No. 243750
**ELLERIN LAW FIRM**
1050 Crown Pointe Pkwy. #400
Atlanta, GA 30338
Tel: (404) 239-9100
imellerin@ellerinlaw.com